IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-45

 No. 224A20

 Filed 23 April 2021

 IN THE MATTER OF: D.A.A.R., S.A.L.R.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 6

 February 2020 by Judge William B. Davis in District Court, Guilford County. This

 matter was calendared in the Supreme Court on 19 March 2021 but was determined

 on the record and briefs without oral argument pursuant to Rule 30(f) of the North

 Carolina Rules of Appellate Procedure.

 Mercedes O. Chut for petitioner-appellee Guilford County Department of Health
 & Human Services.

 Wyrick Robbins Yates & Ponton LLP, by Sean S. Planchard, for appellee
 Guardian ad Litem.

 Sean P. Vitrano for respondent-appellant mother.

 ERVIN, Justice.

¶1 Respondent-mother Amanda R. appeals from the trial court’s order

 terminating her parental rights in D.A.A.R,1 a minor child born in May 2013.2 After

 1 “D.A.A.R.” will be referred to throughout the remainder of this opinion as “Daniel,”

 which is a pseudonym used to protect his identity and for ease of reading. Daniel’s older
 sister, “S.A.L.R.,” was also a subject of the trial court’s order and will be referred to using the
 pseudonym “Sara” throughout the remainder of this opinion for the same reasons.
 2 The challenged trial court order also terminated the parental rights of the father

 Jesse B. in both children. Although the father noted an appeal to this Court from the trial
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 careful consideration of respondent-mother’s challenges to the trial court’s

 termination order in light of the record and the applicable law, we conclude that the

 trial court’s order should be reversed.

 I. Factual and Procedural Background

¶2 On 26 July 2017, the Guilford County Department of Health and Human

 Services filed juvenile petitions alleging that Daniel and Sara were neglected and

 dependent juveniles and obtained the entry of orders taking them into nonsecure

 custody. The process that led to the filing of these juvenile petitions began when

 DHHS received a child protective services report on 7 April 2017 describing an

 incident of domestic violence between the parents during which the father held a gun

 to respondent-mother’s head. In the course of the ensuing investigation, DHH

 learned of substance abuse by both parents, having been told, among other things,

 that respondent-mother “was selling her Suboxone medication and buying urine to

 pass drug screens in order to receive more Suboxone.” In addition, the parents failed

 to attend scheduled meetings with DHHS personnel and vacated their residence

 without informing DHHS that they intended to do so. On 30 May 2017, the father

 court’s termination order, he subsequently sought leave from this Court to withdraw his
 appeal, a request that this Court allowed on 15 July 2020.
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 was charged with the commission of numerous felonies, including robbery with a

 dangerous weapon and possession of a firearm by a felon.3

¶3 After leaving Sara in the care of a family friend for what was supposed to be a

 single night, respondent-mother was “nowhere to be found” when the friend

 attempted to return Sara to her on the following day. In addition, respondent-mother

 was reported to be homeless and living in a hotel. However, respondent-mother was

 ultimately found with Daniel in the home of a former neighbor after DHHS received

 a report that respondent-mother and the former neighbor had been engaging in

 substance abuse in Daniel’s presence. On 24 July 2017, respondent-mother was

 arrested and taken into custody by officers of the High Point Police Department at

 the neighbor’s residence. Although respondent-mother agreed to place Daniel with

 her grandmother pending her release from the Guilford County Detention Center and

 to participate in a child and family team meeting with DHHS, she failed to attend

 the child and family team meeting, which had been scheduled for 26 July 2017.

¶4 After a hearing held on 16 November 2017 for the purpose of considering the

 issues raised by the neglect and dependency petitions, Judge Angela C. Foster

 entered an order on 8 January 2018 finding that Daniel and Sara were neglected and

 dependent juveniles and continued them in DHHS custody. Judge Foster’s order

 3 The father was eventually convicted of committing serious criminal offenses and was

 serving a lengthy prison sentence at the time of the termination hearing.
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 determined that the barriers to the children’s reunification with the parents included

 their “volatile relationship and history of domestic violence,” their untreated “mental

 health and substance abuse issues,” and the lack of stable housing that was suitable

 for them and the children. Judge Foster noted that, even though respondent-mother

 had been participating in weekly visitation sessions with the children, she had not

 attended the adjudication hearing, with her current location being unknown. As a

 result, Judge Foster ordered respondent-mother to enter into a service agreement

 with DHHS “and [to] begin complying with the terms and conditions of that

 agreement, if she desires reunification.” Respondent-mother was authorized to have

 one hour of supervised visitation with the children each week.

¶5 Respondent-mother finally entered into a family services agreement with

 DHHS on 26 January 2018. The family services agreement between DHHS and

 respondent-mother was intended to address issues relating to substance abuse;

 domestic violence; emotional and mental health; housing, environmental, and basic

 physical needs; and parenting skills.

¶6 Following a hearing held on 8 February 2018, Judge Foster entered a

 permanency planning order on 26 March 2018 in which she established a primary

 permanent plan for the children of reunification with the parents and a secondary

 plan of adoption. After a hearing held on 8 March 2018, Judge Foster authorized
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 Daniel and Sara to visit their maternal aunt and uncle in another state4 pending final

 approval of the aunt and uncle’s residence pursuant to the Interstate Compact on the

 Placement of Children. The children arrived at their aunt and uncle’s residence on

 30 March 2018 and were allowed to remain in this out-of-state placement after DHHS

 presented the approved ICPC home study to Judge Foster on 5 April 2018.

¶7 At the next permanency planning hearing, which was held on 3 May 2018,

 DHHS advised Judge Foster that it had not heard from respondent-mother since the

 February hearing and that her current location remained a mystery. In light of

 respondent-mother’s failure to make any progress toward satisfying the requirements

 of her family services plan and the father’s apparent lack of interest in the children,

 Judge Foster entered an order on 2 July 2018 in which she changed the primary

 permanent plan for the children to one of adoption, with a secondary plan of

 reunification. In addition, Judge Foster suspended respondent-mother’s visitation

 with the children and directed DHHS to initiate termination of parental rights

 proceedings against respondents within the next sixty days.

¶8 On 4 May 2018, respondent-mother entered a six-month residential substance

 abuse treatment program in the state in which the children were living with their

 4 The trial court granted respondent-mother’s request that her current state of
 residence, which is the same as the state in which the children’s maternal aunt and uncle
 live, not be disclosed to respondent-father. As a result, we will refrain in this opinion from
 specifying the state to which respondent-mother relocated after leaving North Carolina in
 May 2018 and in which the maternal aunt and uncle reside.
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 maternal aunt and uncle. Sara was returned to North Carolina on 25 June 2018 and

 lived in an emergency shelter on a temporary basis. In a consent order entered on 25

 July 2018, Judge Foster allowed respondent-mother to have fifteen minutes of

 supervised telephone contact with Sara twice each week. On 8 August 2018, Sara

 was placed with her maternal great aunt and uncle in Rowan County, with Daniel

 having joined Sara in this placement on 9 August 2018. Throughout this period of

 time, respondent-mother remained in the residential substance abuse treatment

 program which she had entered on 4 May 2018.

¶9 At the next permanency planning hearing, which was held on 20 September

 2018, respondent-mother reported that she was scheduled to complete in-patient

 substance abuse treatment on 30 October 2018, had been attending weekly parenting

 classes and individual and group therapy, and intended to take a domestic violence

 education course. In a permanency planning order entered on 21 November 2018,

 Judge Foster found that, while respondent-mother had “begun to maintain regular

 contact with [DHHS,]” she had yet to begin paying child support relating to the

 children. In light of her progress in substance abuse treatment, respondent-mother

 asked Judge Foster to stay the initiation of termination of parental rights

 proceedings. In view of respondent-mother’s delay in entering into a family services

 agreement with DHHS and a determination that respondent-mother “ha[d] not begun

 to fully engage with the components,” Judge Foster denied respondent-mother’s
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 request and determined that “[i]t is in the best interest of the juveniles that

 termination of parental rights be pursued by the Department against the parents[.]”

¶ 10 On 29 January 2019, respondent-mother filed motions seeking to have her

 visitation rights with Daniel and Sara reinstated and to have the initiation of the

 termination of the parental rights proceeding stayed. In support of this motion,

 respondent-mother provided information concerning her progress toward satisfying

 the conditions of her family services agreement, which included the completion of a

 six-month inpatient substance abuse rehabilitation program; the completion of a

 sixty-day intensive outpatient substance abuse treatment program; the submission

 of negative drug screens on a consistent basis since 26 June 2018; her ongoing

 attendance in substance abuse intensive outpatient treatment; the completion of a

 four-hour domestic violence course; the completion of parenting classes; and the

 leasing of a rent-subsidized residence that was suitable for the children as of 20

 November 2018. Respondent-mother asserted that she had “maintained her sobriety

 since April 2018” and had demonstrated overall “stability for several months” and

 claimed that her supervised phone calls with Sara “appear to be going well.”

¶ 11 On 30 April 2019, before respondent-mother’s motions had been heard and

 decided, DHHS filed a petition seeking to have the parents’ parental rights in Daniel

 and Sara terminated. According to the allegations set out in the termination petition,

 respondent-mother’s parental rights in the children were subject to termination on
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 the basis of neglect, N.C.G.S. § 7B-1111(a)(1), and willfully leaving the children in a

 placement outside the home for more than twelve months without making reasonable

 progress toward correcting the conditions that had led to the children’s removal from

 the family home, N.C.G.S. § 7B-1111(a)(2).

¶ 12 Judge Foster held another permanency planning hearing on 2 May 2019 and,

 in an order entered on 22 July 2019, maintained the children’s primary permanent

 plan of adoption. After making findings that acknowledged respondent-mother’s

 progress toward satisfying the requirements of her family services agreement, Judge

 Foster determined that “[t]he conditions that [had] led to the juveniles coming into

 custody have not been corrected,” that respondent-mother “is not in full compliance

 with the components [of] her service agreement,” and that respondent-mother had

 “not made adequate progress with the components of that agreement within a

 reasonable period of time.” Among other things, Judge Foster held that respondent-

 mother had not seen Daniel since “on or about February 8, 2018”; that she “is

 unemployed, and . . . does not have a source of income”; and that she “has significant

 mental health and substance abuse issues, and . . . needs to demonstrate her ability

 to maintain her sobriety.” Although Judge Foster denied respondent-mother’s motion

 to stay the termination of parental rights proceeding, she precluded the termination

 hearing from beginning prior to a permanency planning hearing scheduled for 22

 August 2019. Judge Foster also granted respondent-mother an additional two-hour
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 visitation session with Sara each month5 while ordering that respondent-mother’s

 visitation with Daniel should “remain[ ] suspended until such time as visits are

 recommended by the juvenile’s therapist.”

¶ 13 On 15 May 2019, the guardian ad litem filed a motion for review in which she

 sought to have all contact between respondent-mother and the children suspended in

 response to unauthorized contact that had occurred between respondent-mother and

 Sara. After holding a hearing for the purpose of considering the issues raised by the

 guardian ad litem’s motion for review on 30 May 2019, Judge Foster entered an order

 suspending all “visitation, phone calls or any other form of communication or contact

 between [respondent-mother] and the juveniles” on 27 June 2019. In her order, Judge

 Foster found that Sara, along with several other children, had run away from the

 group home in which she had been placed with several other juveniles on 12 May

 2019; that the employees of the group home had filed a missing person’s report and

 notified DHHS of Sara’s unauthorized departure from her placement without

 permission on 13 May 2019; and that DHHS had notified respondent-mother of Sara’s

 disappearance by e-mail before inquiring if respondent-mother had heard from Sara.

 Judge Foster further found that respondent-mother had responded to a social

 5 In spite of the fact that Judge Foster had formally authorized the resumption of

 respondent-mother’s visitations with Sara at the 2 May 2019 permanency planning hearing,
 the record reflects that respondent-mother participated in supervised visits with Sara on 9
 March 2019, 6 April 2019, and 4 May 2019.
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

worker’s e-mail by stating that “she had not heard from her daughter” and that

respondent-mother had remained in contact with the social worker until 5:42 p.m. on

13 May 2019, at which point respondent-mother asked the social worker to “keep

[her] posted.” In addition, Judge Foster found that, unbeknownst to DHHS,6

respondent-mother “was present in North Carolina on May 13, 2019 due to a criminal

court appearance in Davidson County” and that, after receiving a phone call from

Sara, respondent-mother had arranged to meet Sara and the other juveniles at

approximately 7:00 p.m. on 13 May 2019 for the ostensible purpose of “pick[ing] up

all the children, feed[ing] them and tak[ing] them somewhere.” Judge Foster found

that, “[w]ithin ten to twenty minutes of the phone call,” respondent-mother had

arrived at the location at which she had arranged to meet Sara in a vehicle driven by

her pastor, Joseph Divinsky, that was also occupied by Sara’s maternal grandmother,

and “physically forced [Sara] into [the] vehicle[.]” Judge Foster also found that,

instead of contacting DHHS, law enforcement officers, or employees of the group

home for the purpose of alerting them about the juveniles’ location, respondent-

mother had taken Sara to buy clothes and eat dinner before staying with Sara

overnight in a Salisbury hotel. Finally, Judge Foster found that respondent-mother

 6 As respondent-mother pointed out at the termination hearing, the written report

submitted by the guardian ad litem in advance of the 2 May 2019 permanency planning
hearing stated that “[respondent-mother] currently has pending charges in Davidson County
with an upcoming court date of May 13, 2019.”
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 had only contacted DHHS for the purpose of having Sara returned to her placement

 after missing two phone calls from the social worker on the morning of 14 May 2019.7

 Based upon these findings, Judge Foster determined that respondent-mother had

 “violated the Court’s prior orders by having contact with [Sara] outside of the court-

 ordered visitation and by having Joseph . . . in the presence of [Sara]” and suspended

 all visitation and other forms of contact between respondent-mother and Sara.

¶ 14 The trial court held a pre-trial hearing in the termination proceeding on 8 July

 2019 and set the matter for hearing on 30 September 2019. On the afternoon of 8

 July 2019, respondent-mother filed a motion in which she sought review of the

 children’s permanent plan on the grounds that she had maintained stable housing

 and sobriety for more than eight months, had “renewed her cosmetology license and

 expect[ed] to have employment soon,” and had obtained a favorable result from an

 ICPC home study. Judge Foster denied respondent-mother’s motion for review by

 means of an order entered on 12 September 2019.

¶ 15 Another permanency planning hearing commenced on 22 August 2019 and

 concluded on 20 September 2019. In an order entered on 17 October 2019, Judge

 Foster found that the ICPC home study that had been ordered for respondent-

 7 Although the trial court found in the termination order that respondent-mother had

 contacted DHHS on 15 May 2019, the undisputed evidence established that respondent-
 mother had phoned the social worker on the morning of 14 May 2019, a fact that suggests
 that the trial court’s reference to initial contact having been made on 15 May 2019 is nothing
 more than a clerical error.
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 mother’s residence had been denied on or about 9 August 2019 and that respondent-

 mother remained unemployed and lacked a source of income. Judge Foster noted

 that respondent-mother “had previously reported that she was receiving financial

 assistance from [Joseph’s] Everlasting Arms Ministry” and “is currently engaged to

 Joseph[.]” Based upon these and other findings, Judge Foster ordered DHHS to

 “pursue termination of parental rights against [the parents] as soon as possible.”

¶ 16 The trial court held a three-day termination of parental rights hearing between

 30 September 2019 and 28 October 2019 and entered an order terminating the

 parents’ parental rights in Daniel and Sara on 6 February 2020. In its termination

 order, the trial court determined that respondent-mother’s parental rights in the

 children were subject to termination on the grounds that she had willfully left them

 in an out-of-home placement for more than twelve months without making

 reasonable progress toward correcting the conditions that led to their removal from

 her home, N.C.G.S. § 7B-1111(a)(2),8 and that DHHS had failed to establish that

 respondent-mother’s parental rights in the children were subject to termination on

 the grounds of neglect, N.C.G.S. § 7B-1111(a)(1). After considering the statutory

 dispositional factors delineated in N.C.G.S. § 7B-1110(a), the trial court concluded

 8 The trial court determined that respondent-father’s parental rights in the children

 were subject to termination for neglect, N.C.G.S. § 7B-1111(a)(1); willful failure to make
 reasonable progress toward correcting the conditions that had led to their removal from the
 family home, N.C.G.S. § 7B-1111(a)(2); failure to establish paternity, N.C.G.S. § 7B-
 1111(a)(5); and abandonment, N.C.G.S. § 7B-1111(a) (7).
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 that, while the termination of respondent-mother’s parental rights would be in

 Daniel’s best interests, the same would not be true with respect to Sara.9 As a result,

 the trial court terminated respondent-mother’s parental rights in Daniel while

 leaving her parental rights in Sara intact. Respondent-mother noted an appeal to

 this Court from the trial court’s termination order.

 II. Substantive Legal Analysis

¶ 17 In seeking relief from the trial court’s termination order before this Court,

 respondent-mother contends that the trial court erred by concluding that her

 parental rights in Daniel were subject to termination pursuant to N.C.G.S. § 7B-

 1111(a)(2). We believe that respondent-mother’s contention has merit.

 A. Relevant Legal Principles

¶ 18 According to well-established North Carolina law,

 [w]e review a district court’s adjudication under N.C.G.S. §
 7B-1111(a) to determine whether the findings are
 supported by clear, cogent and convincing evidence and the
 findings support the conclusions of law. Unchallenged
 findings of fact are deemed supported by competent
 evidence and are binding on appeal. . . .

 The issue of whether a trial court’s findings of fact support
 its conclusions of law is reviewed de novo. . . .

 9 The trial court concluded that the termination of the father’s parental rights would

 be in both children’s best interests.
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 In re J.S., 374 N.C. 811, 814–15 (2020) (cleaned up). As a result, the ultimate issue

 raised by respondent-mother’s challenge to the trial court’s termination order is

 whether the findings of fact that the trial court made in the course of determining

 that respondent-mother’s parental rights in Daniel were subject to termination

 pursuant to N.C.G.S. § 7B-1111(a)(2) have adequate record support and whether the

 trial court’s properly supported findings of fact establish that respondent-mother had

 willfully failed to make reasonable progress toward correcting the conditions that had

 resulted in Daniel’s removal from the family home.

¶ 19 According to N.C.G.S. § 7B-1111(a)(2), a parent’s parental rights in a child are

 subject to termination in the event that “[t]he parent has willfully left the juvenile in

 foster care or placement outside the home for more than 12 months without showing

 to the satisfaction of the court that reasonable progress under the circumstances has

 been made in correcting those conditions which led to the removal of the juvenile.”

 N.C.G.S. § 7B-1111(a)(2). “[A]n adjudication under N.C.G.S. § 7B-1111(a)(2) requires

 that a child be left in foster care or placement outside the home pursuant to a court

 order for more than a year at the time the petition to terminate parental rights is

 filed,” In re J.S., 374 N.C. at 815 (cleaned up), with the reasonableness of the parent’s

 progress to be assessed as of the date of termination hearing. Id.

¶ 20 As this Court has previously stated,

 a finding that a parent acted willfully . . . does not require
 a showing of fault by the parent. A respondent’s prolonged
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 inability to improve her situation, despite some efforts in
 that direction, will support a finding of willfulness
 regardless of her good intentions, and will support a
 finding of lack of progress sufficient to warrant termination
 of parental rights.

In re J.S., 374 N.C. at 815 (cleaned up). On the other hand, “a trial judge should

refrain from finding that a parent has failed to make ‘reasonable progress . . . in

correcting those conditions which led to the removal of the juvenile’ simply because

of his or her failure to fully satisfy all elements of the case plan goals.’ ” In re A.B.C.,

374 N.C. 752, 760 (2020) (quoting In re B.O.A., 372 N.C. 372, 385 (2019)). Moreover,

while a parent’s “compliance with a judicially adopted case plan is relevant in

determining whether grounds for termination exist pursuant to N.C.G.S. § 7B-

1111(a)(2)[,]” In re B.O.A., 372 N.C. at 384,

 the issue of whether or not the parent is in a position to
 actually regain custody of the children at the time of the
 termination hearing is not a relevant consideration under
 N.C.G.S. § 7B-1111(a)(2), since there is no requirement for
 the respondent-parent to regain custody to avoid
 termination under that ground. Instead, the court must
 only determine whether the respondent-parent had made
 “reasonable progress under the circumstances in correcting
 those conditions which led to the removal of the juvenile.”
 N.C.G.S. § 7B-1111(a)(2). Accordingly, the conditions
 which led to removal are not required to be corrected
 completely to avoid termination. Only reasonable progress
 in correcting the conditions must be shown.

In re J.S., 374 N.C. at 819, 845 S.E.2d at 73 (cleaned up).

B. Analysis of the Trial Court’s Findings of Fact
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

¶ 21 The trial court made the following uncontested findings of fact concerning the

 circumstances that led to the children’s placement outside the family home and the

 initial response that respondent-mother made to the children’s placement in DHHS

 custody:

 2. . . . [L]egal and physical custody of the juveniles has
 remained with [DHHS] continuously since July 26,
 2017.

 3. . . . [In a]pproximately, May 2018, [respondent-
 mother] left the state of North Carolina for various
 purposes and reasons, including seeking residential
 treatment placement in the state where [she]
 currently resides, being that it was closer to her
 children, who were placed at the time in the state
 where the mother currently resides, and removing
 herself from close geographic proximity to any
 location where she may encounter [respondent-
 father]. . . .

 ....

 9. The conditions which led to the juveniles coming into
 custody include but are not limited to domestic
 violence between the parents, prior Child Protective
 Services (CPS) history in Randolph County, the
 mother’s mental health issues, the parents’ history
 of unstable housing, and the parents’ substance
 abuse issues.

 ....

 12. The mother has had an opportunity to correct the
 conditions that led to the juveniles’ removal from the
 home, including but not limited to being offered a
 service agreement with the Department.
 [Respondent-mother] willfully delayed entering into
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 a service agreement because she insisted on entering
 into the agreement along with [respondent-father].
 Due to [respondents’] history of domestic violence,
 the Department would not allow a dual service
 agreement.

 According to the trial court, respondent-mother “ultimately entered into the service

 agreement with the Department on January 26, 2018, and it was last updated in

 January 2019.”

¶ 22 Next, the trial court made findings that detailed the progress that respondent-

 mother had made in addressing the five components of the family services agreement

 that she entered into with DHHS. The trial court’s findings with respect to each of

 these issues can be summarized as follows:

 1. Substance abuse

¶ 23 The trial court found that respondent-mother had enrolled in a six-month

 residential substance abuse program on 4 May 2018, had successfully completed the

 program on 30 October 2018, had “enrolled herself into an intensive outpatient

 substance abuse program” after completing inpatient treatment, and had completed

 all three phases of intensive outpatient treatment by 30 April 2019. In addition, the

 trial court found that respondent-mother “continues to work with Baptist Health

 regarding her ongoing mental health treatment and therapy” and had submitted a

 sufficient number of consecutive negative drug screens to satisfy DHHS that the drug
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 screening process could be discontinued. As a result, the trial court determined that

 “[respondent-mother was] in compliance with this component of her case plan.”

 2. Domestic violence

¶ 24 The trial court found respondent-mother had left North Carolina in early May

 2018 for the purpose, at least in part, of “remov[ing] herself from close geographic

 proximity to any location where she may encounter [the father].” In addition to

 extricating herself from her relationship with the father, the trial court found that

 respondent-mother had completed a four-hour domestic violence course in her current

 state of residence in October 2018, that she had completed “an eight-hour domestic

 violence class and counseling” on 5 April 2019, and that “[n]o other domestic violence

 courses were recommended” for respondent-mother. As a result of her participation

 in this educational and treatment process and the fact that she had not been involved

 in any incidents of domestic violence since leaving North Carolina, the trial court

 found that respondent-mother was “in compliance with this portion of her case plan.”

 3. Emotional and Mental Health Needs

¶ 25 The trial court found that respondent-mother “is actively engaged in therapy

 and treatment regularly and has consistently done so from the time she left the State

 of North Carolina, up to and through the date of this hearing.” As a result, the trial

 court concluded that respondent-mother was “in compliance with this component of

 her case plan.”
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 4. Housing, Environment, and Basic Physical Needs

¶ 26 The trial court made the following findings of fact with respect to issues

 relating to housing, the environment in which respondent-mother lived, and

 respondent-mother’s ability to satisfy her basic physical needs and those of the

 children:

 [Respondent-mother] was ordered to obtain and maintain
 a suitable home for the juveniles and . . . maintain all
 utilities without service interruption for 6 months and pay
 the rent each month on time . . . .

 In approximately May of 2018, [respondent-mother] . . .
 entered into a residential treatment program for
 approximately six months. At the completion of the
 program, [she] . . . obtained housing on November 20, 2018
 in her current state of residence. [Respondent-mother]
 provided [DHHS] Social Worker [Aricia Ross-Clayton] with
 a copy of her lease as proof of residence with the juveniles’
 names on the lease. She currently receives a stipend to
 help with utilities from the state [where] she resides as
 well as clothes, food and financial assistance from a local
 charity. An ICPC home study request was completed by
 the County Department of Human Services in the state
 where she is currently residing on August 27, 2019. The
 ICPC home study was completed and the home was
 appropriate with working utilities. However, the ICPC
 home study was denied due to [respondent-mother’s]
 current criminal history. The local authorities were
 notified that [respondent-mother] was the biological parent
 and they denied the ICPC home study contrary to their
 policies for a biological parent on the basis of previous
 criminal history.

 Approximately one week after the hearing held on October
 1, 2019, Social Worker Ross-Clayton received a letter from
 Jessica Doherty with the Department of Social Services in
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 [respondent-mother’s] current state of residence regarding
 exceptions to the ICPC home study policy in regard to
 biological parents. Ms. Doherty indicated that their
 Department would be willing to monitor the mother’s
 home, due to her being the biological parent, despite prior
 CPS or criminal history.

 However, this error was not discovered within a sufficient
 period of time to be corrected without requiring the
 execution of a completely new ICPC Home Study, which
 could take several months. The juveniles have been in the
 custody of [DHHS] for a period in excess of two years and
 continuing custody for the purpose of conducting a new
 ICPC home study will continue to prolong the juveniles’
 placement with [DHHS] without permanence.

 ....

 . . . [Respondent-mother] is in compliance of this component
 of her case plan. The only caution by the Court is that [she]
 is not currently earning sufficient income to maintain
 housing independently without external assistance, but . . .
 there is no reason to think the home is not stable for the
 indefinite period in the future.

 As a result of the fact that no party to this proceeding has challenged the sufficiency

 of the evidentiary support for these findings, they are binding upon us for purposes

 of appellate review. See Koufman v. Koufman, 330 N.C. 93, 97 (1991).

¶ 27 On the other hand, respondent-mother does challenge the sufficiency of the

 evidentiary support for the portion of Finding of Fact No. 20(a)(1) stating that she

 had “fail[ed] to provide housing currently acceptable and appropriate for the juveniles

 to have any possibility of being placed in her care” lacks sufficient evidentiary

 support. According to both the record evidence and the trial court’s findings of
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 evidentiary fact, however, respondent-mother had leased a residence that was

 suitable for herself and the children and had working utilities since November 2018.

 As of the time of the termination hearing, respondent-mother had maintained

 occupancy of this residence for a period of almost one year. For that reason, the trial

 court expressly found that respondent-mother was “in compliance of this component

 of her case plan” and that “there [was] no reason to think the home is not stable for

 the indefinite period in the future.”

¶ 28 As is reflected in its findings of fact, the trial court’s concern about the stability

 and sufficiency of respondent-mother’s housing arrangements did not stem from any

 deficiency in the condition of the premises that respondent-mother occupied or

 respondent-mother’s ability to continue leasing those premises. Instead, the trial

 court’s concern about respondent-mother’s housing arrangements rested solely upon

 the unfavorable result of the ICPC home study. However, the unfavorable result in

 question rested upon an error made by the relevant agency in the state in which

 respondent-mother resided coupled with the trial court’s unwillingness to tolerate the

 additional delay in achieving permanency for the children that would inevitably

 result from the performance of another ICPC home study. In other words, the trial

 court’s findings indicate that the necessity for the second home study resulted from

 an error made by the relevant agency in the state in which respondent-mother resided

 rather than from respondent-mother’s conduct. As a result, we conclude that the
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 challenged portion of Finding of Fact No. 20(a)(1) relating to respondent-mother’s

 failure to provide acceptable housing lacks sufficient evidentiary support, so that we

 will disregard the relevant portion of that finding of fact in evaluating whether the

 trial court’s findings of fact support its determination that respondent-mother’s

 parental rights in the children were subject to termination pursuant to N.C.G.S. § 7B-

 1111(a)(2).10 See In re S.D., 374 N.C. 67, 75 (2020).

 5. Parenting Skills

¶ 29 The trial court found that respondent-mother was in “partial compliance” with

 the component of her family services agreement that was intended to address issues

 relating to parenting skills. The trial court found that, while respondent-mother had

 failed to complete the Parenting Assessment Training Education Program prior to

 leaving North Carolina, she had completed “a parenting class through . . . an agency

 in her state and county of residence . . . on October 29, 2018,” “[i]n lieu of the PATE

 program.” In addition, the trial court found that respondent-mother had completed

 a “Nurturing Parenting Program” on 20 February 2019. According to the trial court,

 10 In its brief before this Court, DHHS posits that respondent-mother might not be

 able to renew her subsidized lease at the expiration of her current lease term. The trial court
 expressly found, however, that there was “no reason to think the home is not stable” for the
 foreseeable future. As the Court of Appeals has correctly determined, reliance upon such
 speculative concerns does not suffice to demonstrate a lack of reasonable progress for
 purposes of N.C.G.S. § 7B-1111(a)(2). See In re Nesbitt, 147 N.C. App. 349, 359 (2001)
 (“conclud[ing] that the petitioner has failed to meet its burden of demonstrating by clear,
 cogent and convincing evidence the absence of reasonable progress related to housing to
 support termination of [the respondent-mother’s] parental rights”).
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 the parenting courses that respondent-mother had completed provided “no

 opportunity for the instructor to observe [her] directly interact with the [children] in

 order to evaluate her ability to put the skills and knowledge she learned into action

 in an actual parenting situation.”

¶ 30 In addition, the trial court found that respondent-mother had obtained a

 “parenting psychological assessment through [a provider] located in her current state

 of residence” on 22 April 2019. According to the trial court, no treatment had been

 recommended for respondent-mother, with the assessor having reported that

 respondent-mother “shows no problematic concerns regarding her current parenting

 or past substance abuse history.”

¶ 31 The trial court further found that respondent-mother had not visited Daniel

 since February 2018 and that her visitation with the children remained in a state of

 suspension at the time of the termination hearing. In spite of the fact that

 respondent-mother had been allowed to visit with the children in the aftermath of

 their removal from the family home, the trial court found that she had “stopped

 showing up to her visits and subsequently her visits with the [children] were

 suspended from May 3, 2018 until March 7, 2019, when her visitation with [Sara]

 was reinstated on a monthly basis. Although the trial court found “no evidence of

 concern” in connection with the supervised visits that respondent-mother had with

 Sara in March, April, and May 2019, those visits were suspended on 30 May 2019
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 “due to [her] actions in response to [Sara] running away from Nazareth Children’s

 Home.”

¶ 32 Respondent-mother argues that a portion of Finding of Fact No. 12(a) that

 describes her handling of the “runaway incident” during 13–14 May 2019 lacks

 sufficient evidentiary support. Even though respondent-mother has not disputed the

 sufficiency of the evidence to support the manner in which the trial court described

 her actions during the “runaway incident” or its finding that her “contact with [Sara]

 during that time violated the existing court orders that limited her to specifically

 scheduled and supervised visitations” and prohibited Sara from “being in the

 presence of [Joseph,]” respondent-mother objects to the trial court’s determination

 that the manner in which she responded to this situation “indicates clear issues

 related to [respondent-mother’s] parenting skills, reflecting that [she] is not in full

 compliance with this component of her case plan.”

¶ 33 As an initial matter, we note that the trial court did not find “clear issues

 related to [respondent-mother’s] parenting skills” based solely upon her decision to

 keep Sara in her custody overnight on 13–14 May 2019 instead of immediately

 notifying law enforcement officials, DHHS, and employees of the group home that she

 had located Sara and was providing care for her. Among other things, the trial court

 also pointed to respondent-mother’s actions after the children entered DHHS custody,

 including “the suspension of her visitation on two separate occasions,” as indicating
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 the existence of unaddressed deficiencies in respondent-mother’s parenting skills.

 (Emphasis added). Aside from the fact that respondent-mother does not challenge

 the sufficiency of the evidence to support the trial court’s findings concerning the

 initial suspension of her visitation rights at the time of the 3 May 2018 permanency

 planning hearing, we note that the 2 July 2018 permanency planning order reflects

 dissatisfaction with respondent-mother’s ongoing substance abuse problems and the

 absence of any meaningful progress toward satisfying the requirements of her family

 services plan.

¶ 34 As far as the “runaway incident” is concerned, we are not unsympathetic to

 respondent-mother’s contention that her primary concern at the time that she

 arranged to meet her daughter on the evening of 13 May 2019 was for Sara’s physical

 and emotional well-being.11 On the other hand, we are prohibited by well-established

 principles of North Carolina law from looking behind the trial court’s determination

 that respondent-mother’s failure to contact DHHS until the following morning

 reflected poor judgment on respondent-mother’s part and violated prior court orders

 given that the trial court’s evaluation of respondent-mother’s conduct is reasonable

 and constitutes nothing more than permissible fact-finding that has adequate

 evidentiary support. See generally In re D.L.W., 368 N.C. 835, 843 (2016) (recognizing

 11 As an aside, we note that the trial court did not find that respondent-mother had

 been in contact with Sara prior to respondent-mother’s last e-mail exchange with the social
 worker at 5:42 p.m. on 13 May 2019.
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 that the trial court has the responsibility, acting in its capacity as the trier of fact, to

 weigh and draw reasonable inferences from the evidence).

¶ 35 Similarly, we reject respondent-mother’s contention that the trial court erred

 by considering the “emergency decisions regarding her runaway teenage daughter”

 and her initial “delay in entering a case plan” after the children had been taken into

 DHHS custody to be relevant to the issue of whether respondent-mother’s parental

 rights in the children were subject to termination pursuant to N.C.G.S. § 7B-

 1111(a)(2). As far as the first of these two objections is concerned, it is clear to us

 that the making of “emergency decisions” is an inherent part of parenting and may

 appropriately be considered by a trial court in the course of evaluating a parent’s

 parenting skills. In addition, we note that, instead of faulting respondent-mother for

 making a split-second decision under the influence of the stress of Sara’s

 disappearance, the trial court’s findings reflect a failure of judgment on the part of

 respondent-mother that occurred over a period of more than twelve hours, during

 which respondent-mother withheld information concerning Sara’s locations from her

 lawful custodians.

¶ 36 In the same vein, we hold that a parent’s delay in signing a case plan or

 attempting to address the conditions leading to a child’s removal from the home has

 indisputable relevance to an evaluation of the willfulness of a parent’s conduct and

 the reasonableness of that parent’s progress in correcting the conditions that had led
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

to a child’s removal from the family home for purposes of N.C.G.S. § 7B-1111(a)(2).

See In re I.G.C., 373 N.C. 201, 206 (2019) (affirming a trial court’s determination that

a parent’s parental rights were subject to termination pursuant to N.C.G.S. § 7B-

1111(a)(2) on the grounds that the trial court’s findings demonstrated that

“respondent-mother waited too long to begin working on her case plan and that, as a

result, she had not made reasonable progress toward correcting the conditions that

led to the children’s removal by the time of the termination hearing”); In re Moore,

306 N.C. 394, 405 (1982) (affirming a trial court’s determination that a parent’s

parental rights were subject to termination for failure to make reasonable progress

where the “respondent left the children in foster care for more than four years,” “did

not visit or communicate with them or make any serious effort to do so” during the

first three years of their time in foster care, and “made arrangements to visit the

children and manifested some efforts to arrange a place for the children to live with

her” only after the termination petition had been filed). Although the trial court is,

of course, required to consider any progress that the parent might have made up to

and including the date of the termination hearing in determining the reasonableness

of his or her efforts to eliminate the conditions that had led to a child’s removal from

the family home, see In re I.G.C., 373 N.C. at 206, it should also evaluate the

reasonableness of any progress that the parent has made in light of the amount of

time that the parent had been given to make that progress. See In re J.S., 374 N.C.
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 811, 820–21 (2020) (stating that, “[i]n light of . . . the fact that respondent was

 afforded almost three years to achieve a home environment suitable for her children,

 we conclude that the trial court did not err by finding that respondent failed to make

 reasonable progress pursuant to N.C.G.S. § 7B-1111(a)(2) under these conditions and

 by finding that her failure to do so was willful”).

¶ 37 Finally, we have no hesitation in rejecting respondent-mother’s suggestion

 that the trial court was not entitled to evaluate the parenting decisions that she made

 relating to Sara in evaluating the reasonableness of her progress with regard to

 Daniel. As the trial court’s findings reflect, the conditions that led to the children’s

 removal from the family home and the requirements set out in respondent-mother’s

 family services agreement with DHHS were not child-specific. As a result, to the

 extent that respondent-mother’s interactions with Sara shed light upon the nature

 and extent of her parenting skills, evidence concerning those interactions was equally

 relevant to an evaluation of the progress that respondent-mother had made in

 correcting the conditions that had led to Daniel’s removal from the family home for

 purposes of N.C.G.S. § 7B-1111(a)(2). Cf. In re Allred, 122 N.C. App. 561, 564 (1996)

 (concluding that the parent’s prior neglect of four older children was admissible for

 the purpose of shedding light upon the issue of whether a different child was likely to

 be neglected in the event that that child was returned to the parent’s care); cf. also

 N.C.G.S. § 7B-101(15) (2019) (providing that, “[i]n determining whether a juvenile is
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 a neglected juvenile, it is relevant whether that juvenile . . . lives in a home where

 another juvenile has been subjected to abuse or neglect by an adult who regularly

 lives in the home”). The relevance of respondent-mother’s inactions with Sara is

 particularly obvious in this case given the absence of any interactions between

 respondent-mother and Daniel since February 2018. As a result, we reject

 respondent-mother’s challenge to the relevant portion of the trial court’s findings.

 C. Reasonableness of Respondent-Mother’s Progress

¶ 38 In light of our determinations with respect to respondent-mother’s challenges

 to the trial court’s findings of evidentiary fact, we move to a consideration of her

 contention that the trial court’s findings do not support its determination that she

 willfully failed to make reasonable progress toward correcting the conditions that had

 led to the children’s removal from her home pursuant to N.C.G.S. § 7B-1111(a)(2).

 Although this Court and the Court of Appeals have previously characterized this and

 related grounds for termination as both an “ultimate finding” and a “conclusion” of

 law, we review the sufficiency of the trial court’s findings to support its determination

 that a parent’s parental rights in a child are subject to termination pursuant to

 N.C.G.S. § 7B-1111(a)(2) using a de novo standard of review regardless of the manner

 in which the trial court’s decision is ultimately characterized. See In re A.B.C., 374

 N.C. at 761 (holding that the “unchallenged findings of fact support the trial court’s

 conclusion that respondent failed to make reasonable progress to correct the
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 conditions that led to the removal of [the juvenile] from her care” (footnote omitted));

 In re W.K., 376 N.C. 269, 273 (2020) (characterizing a trial court’s determination of

 “neglect” for purposes of N.C.G.S. § 7B-1111(a)(1) as an “ultimate finding”); see also

 In re Z.D., 258 N.C. App. 441, 449 (2018) (stating that, “[b]ecause the evidence and

 findings were insufficient to support the trial court’s ultimate finding that

 Respondent failed to make reasonable progress, we hold the findings do not support

 the conclusion that grounds existed pursuant to N.C.[G.S.] § 7B-1111(a)(2) to

 terminate Respondent’s parental rights”); In re J.S.L., 177 N.C. App. 151, 163 (2006)

 (stating that “[t]he trial court failed to make findings of fact to support a conclusion

 that respondent father ‘willfully left the [children] in foster care for more than 12

 months without showing . . . reasonable progress under the circumstances has been

 made in correcting those conditions which led to the removal of the [children]’ ”

 (alterations in original) (quoting N.C.G.S. § 7B-1111(a)(2))).

¶ 39 In its termination order, the trial court stated that respondent-mother’s

 parental rights in the children were subject to termination pursuant to N.C.G.S. § 7B-

 1111(a)(2) because:

 The mother has willfully left the juveniles in foster care or
 placement outside of the home for more than 12 months
 without showing to the satisfaction of the Court that
 reasonable progress under the circumstances ha[s] been
 made in correcting those conditions, which led to the
 removal of the juveniles. This finding is not based on the
 reason that the mother cannot care for the juveniles on the
 account of poverty, but is based solely on the fact [of] the
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 mother’s delayed engagement in her case plan as noted in
 this order[;] the failure of her to provide housing currently
 acceptable and appropriate for the juveniles to have any
 possibility of being placed in her care[; t]he likelihood, that
 if this ground were not found, and this case continues
 under the current circumstances, the juveniles will simply
 remain in the custody of [DHHS] indefinitely with no
 ability to make progress towards any reunification nor
 adoption, and would not be able to make progress on any
 existing permanent plan; as well as the evidence
 concerning the mother’s parental decision making from the
 runaway incident set forth in the findings of fact.

 For the reasons set forth above, we will disregard the trial court’s reference to

 respondent-mother’s supposed “failure . . . to provide housing currently acceptable

 and appropriate for the juveniles to have any possibility of being placed in her care,”

 see In re S.D., 374 N.C. at 83, in evaluating the validity of the trial court’s

 determination that respondent-mother’s parental rights in the children were subject

 to termination pursuant to N.C.G.S. § 7B-1111(a)(2).

¶ 40 According to respondent-mother, “the record and undisputed findings of fact

 establish that [she] made significant and reasonable progress in resolving the

 conditions that brought the children into DHHS custody.” We are unable to dispute

 the validity of this argument given that the record evidence and the trial court’s

 findings establish that respondent-mother had made consistent and sustained

 progress toward correcting the conditions that had led to the children’s removal from

 the family home beginning in May 2018, when she left North Carolina and entered

 residential substance abuse treatment in the state in which the children were, at that
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

time, residing. Among other things, respondent-mother removed herself from

proximity to respondent-father, an action that had the effect of significantly reducing

the likelihood of continued domestic violence between the parents. By the time of the

termination hearing, respondent-mother had maintained her sobriety for

approximately seventeen months and had maintained housing that was suitable for

herself and the children for approximately twelve months. During the same period

of time, respondent-mother had availed herself of multiple opportunities to obtain

education and treatment relating to her substance abuse, mental and emotional

health, domestic violence, and parenting skills problems. As a result, the record

evidence and the trial court’s findings establish that respondent-mother had

addressed each of the direct or indirect causes for the children’s removal from her

home. Cf. In re K.D.C., 375 N.C. 784, 794–95 (2020) (reversing a trial court

determination that the parent’s parental rights were subject to termination pursuant

to N.C.G.S. § 7B-1111(a)(2) on the grounds that the record failed to show that the

parent had failed to comply with the provisions of her case plan that were intended

to address her substance abuse problems and established that the parent’s failure to

complete parenting classes was mitigated by her completion of a “Mothering class”).

As a result, after conducting the required de novo review, we hold that the trial court’s

findings of fact simply do not support a determination that respondent-mother had

willfully left the child in foster care or a placement outside the home without showing
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 to the satisfaction of the court that reasonable progress under the circumstances had

 been made in correcting the conditions that had led to the child’s removal pursuant

 to N.C.G.S. § 7B-1111(a)(2).

¶ 41 In urging this Court to affirm the trial court’s order, the guardian ad litem

 emphasizes the fact that Daniel had been in DHHS custody for twenty-seven months

 as of the time of the termination hearing and argues that this case is similar to In re

 I.G.C., in which, even though the parent had been given two years within which to

 correct the conditions that had resulted in the child’s removal from the home, the

 bulk of her progress had been made “between the court’s cessation of reunification

 efforts and the termination hearing.” 373 N.C. at 204. The guardian ad litem notes

 that, in upholding the trial court’s determination that the parent’s parental rights

 were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2) in In re I.G.C., we

 pointed to the presence of “findings which showed that respondent-mother waited too

 long to begin working on her case plan and that, as a result, she had not made

 reasonable progress toward correcting the conditions that led to the children’s

 removal by the time of the termination hearing.” Id. at 206 (emphasis added).

¶ 42 The facts in this case are, however, clearly distinguishable from those at issue

 in In re I.G.C. The trial court’s findings in this case show that respondent-mother

 began to make significant progress in May 2018 and had continued to do so up to the

 time of the termination hearing, making her actions quite unlike the “limited
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

achievements” of the parent in I.G.C., who “failed to complete the recommended

treatment needed to fully address the core issues of substance abuse and domestic

violence which had played the largest roles in the children’s removal.” In re I.G.C.,

373 N.C. at 205. In addition, the parent in In re I.G.C. “failed to obtain stable housing

for at least six months[,]” id. at 205, 835 S.E.2d at 435, and acknowledged at the

termination hearing that “she would not feel comfortable having the children

returned to her care for another ‘year, year and a half’ because she feared the

possibility that she would relapse.” Id. at 205. Simply put, this case simply does not

involve last-minute, limited steps taken by a parent faced with the looming prospect

of having his or her parental rights terminated of the type that existed in I.G.C, cf.

In re O.W.D.A., 375 N.C. 645, 653–54 (2020) (concluding that a parent’s “eleventh-

hour efforts” that resulted in “some minimal progress during his most recent

incarceration” were insufficient to “outweigh the evidence of his persistent failures to

make improvements while not incarcerated” for the purpose of determining the

“probability of repetition of neglect” under N.C.G.S. § 7B-1111(a)(1)); “[e]xtremely

limited progress” by a parent, In re Nolen, 117 N.C. App. 693, 700 (1995), or the

“prolonged inability” of a parent “to improve her situation, despite some efforts in

that direction[,]” In re B.S.D.S., 163 N.C. App. 540, 546 (2004). On the contrary, the

trial court’s properly supported findings demonstrate the existence of sustained and
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 largely successful efforts by respondent-mother to satisfy the requirements of her

 case plan.

¶ 43 As both DHHS and the guardian ad litem point out, an analysis of the trial

 court’s findings reflects that the sole unresolved issue that respondent-mother faced

 at the time of the termination hearing involved her failure to fully demonstrate

 sufficient improvement in her parenting skills. Admittedly, respondent-mother had

 not visited Daniel since February 2018. For that reason, respondent-mother had not

 been able to show, in a practical setting, that she had been able to actually achieve

 the positive results that one might have predicted based upon her successful

 completion of parenting courses in October 2018 and February 2019 and the favorable

 parenting assessment that she received in April 2019. On the other hand, the record

 reflects that respondent-mother unsuccessfully requested the trial court to reinstate

 her visitation rights relating to Daniel in January 2019 in light of the substantial

 progress that she claimed to have made in satisfying the requirements of her family

 services agreement and that she lacked the ability to require the trial court to allow

 her to visit with Daniel. See In re K.L.T., 374 N.C. 826, 840, (2020). Moreover, as

 respondent-mother notes in her reply brief, the trial court had been amenable to

 allowing the resumption of her visits with Daniel at the time of the 2 May 2019

 permanency planning hearing in the event that Daniel’s therapist viewed the

 prospect of such visits in a favorable light, an event that had not occurred as of 30
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 May 2019, when Judge Foster suspended her contact with the children in the

 aftermath of the “runaway incident.” Finally, the record contains no indication that

 Daniel’s therapist had any concerns about respondent-mother’s progress in satisfying

 the requirements of her family service agreement or her parenting skills or any

 indication that anything untoward had occurred during respondent-mother’s three

 supervised visits with Sara in March, April, and May 2019.

¶ 44 Although the trial court was, as we have already indicated, fully entitled to

 consider respondent-mother’s actions during the “runaway incident” in assessing

 whether her parental rights in the children were subject to termination pursuant to

 N.C.G.S. § 7B-1111(a)(2), her actions on that occasion must be viewed in the context

 of her overall success in addressing the principal causes for the children’s removal

 from her home, including her problems with substance abuse, domestic violence,

 mental health, and housing instability, and her partial success in satisfying the

 parenting skills component of her family services agreement. See In re K.D.C., 375

 N.C. at 794–95. After considering the trial court’s properly supported findings in

 their entirety, we conclude that respondent-mother’s serious error of judgment at the

 time of the “runaway incident” is not sufficient, without more, to support the trial

 court’s conclusion that respondent-mother had willfully failed to make reasonable

 progress toward correcting the conditions that had led to the children’s removal from

 the family home. As a result, the trial court’s properly supported findings of fact,
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

 considered in their entirety, simply do not suffice to support its determination that

 respondent-mother’s parental rights in the children were subject to termination

 pursuant to N.C.G.S. § 7B-1111(a)(2).

¶ 45 Our decision that the trial court’s termination order should be reversed is

 bolstered by the trial court’s determination that respondent-mother’s parental rights

 in the children were not subject to termination for neglect pursuant to N.C.G.S. § 7B-

 1111(a)(1) in view of DHHS’ failure to prove that the children would probably

 experience future neglect if they were returned to respondent-mother’s care. In view

 of the fact that respondent-mother was not required to show that her immediate

 reunification with the children would be appropriate in order to preclude a

 determination that her parental rights in the children were subject to termination

 pursuant to N.C.G.S. § 7B-1111(a)(2), see In re J.S., 374 N.C. at 819–20,12 the trial

 court’s conclusion that DHHS had failed to show a likelihood of further neglect tends

 to suggest that respondent-mother had, in fact, made adequate progress in correcting

 the conditions that had led to the children’s removal from the family home. As a

 result, for all of these reasons, the trial court’s order terminating respondent-mother’s

 parental rights in Daniel is reversed.

 12 We do not, of course, wish to be understood as holding that a parent could never be

 required to be able to immediately reunify with the children in order to avoid a finding that
 his or her parental rights in the children were not subject to termination pursuant to
 N.C.G.S. § 7B-1111(a)(2); we simply hold that, no such requirement could have been
 appropriately imposed in this case.
 IN RE D.A.A.R., S.A.L.R.

 2021-NCSC-45

 Opinion of the Court

REVERSED.